UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RAINEY FLORENCE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Cause No. 1:12-cv-603-WTL-TAB |
| ) | |
| CAROLYN COLVIN, Acting ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Rainey Florence requests judicial review of the final decision of Defendant Carolyn Colvin, Acting Commissioner of the Social Security Administration ("Commissioner"), denying her application for Disability Insurance Benefits ("DIB") and Supplemental Insurance Benefits ("SSI") under Titles II and XVI of the Social Security Act ("the Act"). The Court rules as follows.

## I. PROCEDURAL HISTORY

Florence filed for SSI and DIB on September 9, 2008, alleging that she became disabled September 8, 2008, primarily due to arthritis, fibromyalgia, morbid obesity, chronic pain, and adjustment disorder. Florence's applications were denied initially on February 9, 2009, and again on reconsideration on April 24, 2009. Following the denial on reconsideration, Florence requested and received a hearing in front of an Administrative Law Judge ("ALJ"). A hearing, during which Florence was represented by counsel, was held by ALJ Joel Fina on January 13, 2011. A medical

---

[1] Carolyn Colvin became Acting Commissioner of the Social Security Administration after this case was filed. She is therefore substituted as the Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d).

1

expert and a vocational expert testified at the hearing. ALJ Fina issued his decision denying Florence's application on February 16, 2011. The Appeals Council denied Florence's request for review on March 26, 2012, after which Florence filed this appeal.

## II. **APPLICABLE STANDARD**

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment that exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, she is not disabled, despite her medical condition and other factors. 20 C.F.R. § 404.1520(b).[2] At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able

---

[2] The Code of Federal Regulations contains separate sections relating to DIB and SSI that are identical in all respects relevant to this case. For the sake of simplicity, this Entry contains citations to DIB sections only.

to perform her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 404.1520(g).

On review of the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id*., and this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). The ALJ must articulate his analysis of the evidence in his decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into his reasoning . . . [and] build an accurate and logical bridge from the evidence to his conclusion." *Id.*

### III. MEDICAL EVIDENCE

Florence suffers from arthritis, fibromyalgia, morbid obesity, chronic pain, and adjustment disorder. Relevant portions of her medical records follow.

#### A. Physical Treatment

In May 2007, Dr. Thomas Sullivan conducted a sleep study for Florence. Results indicated "very disrupted sleep" and "at least moderate obstructive sleep apnea." Dr. Sullivan prescribed the

3

use of a CPAP machine at night and advised Florence to return for a full consultation and additional review.

In July 2007, Florence visited the ER for knee pain, which occurred when walking. She was diagnosed with patella-femoral syndrome. Florence also complained of shortness of breath, but a September 2007 chest x-ray revealed no sign of disease.

In April 2008, Florence visited the Martindale Brightwood Health Center for joint pain. She reported "lots of pain" that worsened throughout the day. Her pain was attributed to arthritis.

Florence returned to the Health Center in May 2008 complaining of arthritis pain and coughing. She was prescribed Prednisone, Plaquenil, and Darvocet for the joint pain. At that time, Florence reported that she had an appointment with a rheumatologist in September.

In June 2008 Florence visited Dr. Ernesto Levy, a rheumatologist, complaining of generalized pain. Dr. Levy performed x-rays of Florence's knees, feet, hips, and spine. In his follow-up letter to Florence, Dr. Levy reported that the x-rays showed some "wear and tear arthritis" in Florence's knees, and "mild degenerative changes (wear and tear changes) present in her spine and hip." Dr. Levy opined that Florence would benefit from weight loss as a way of improving overall body mechanics. In his report to Florence's treating physician, Dr. C. Anderson, Dr. Levy noted that Florence was not compliant with her CPAP sleep therapy. Dr. Levy reported that he had evaluated her for generalized pain. He noted her report that she had recently quit a physically demanding job in a warehouse due to her chronic pain and Florence had become tearful when he inquired about her current stressors. Florence had decreased flexion in both knees and multiple tender points in her upper-, mid-, and low back and the lateral aspect of her extremities. He identified twelve tender points in all. Dr. Levy recommended further testing to determine

whether Florence suffered from fibromyalgia or lupus. He noted that the "main compounders" of Florence's fibromyalgia would be depression and sleep apnea.

In September 2008, Florence was treated by Dr. Nadersion at the Martindale Brightwood Health Center clinic. She reported pain in her knees that was not helped by medication. She also reported pain in her fingers and hand. Dr. Anderson noted crepitus in Florence's right knee and swelling in both knees. He prescribed continued medication for her fibromyalgia and suggested a referral to a podiatrist to treat her foot pain.

In December 2008, Florence underwent a lung function test. According to the medical expert's analysis of the test results at the hearing, Florence intentionally underperformed on the test.

In February 2009, Florence saw Dr. Anderson complaining that her current pain medication was not effective and received a new prescription.

On March 31, 2009, Florence reported to Dr. Anderson that the new pain medication worked better, but she was not sleeping well. At that time, Dr. Anderson and Florence discussed disability. Dr. Anderson then wrote a note that "Ms. Rainey Florence suffers from fibromyalgia and osteoarthritis. [She] is unable to work at this time. [She] is currently under medical management for these problems."

Florence returned to Dr. Anderson in April and June 2009 with complaints of knee problems, knee and foot pain, tingling sensations, shooting pain, and her knee giving out. Florence reported that Vicodin was not relieving her pain, so stronger Vicodin was prescribed. On June 23, 2009, Dr. Anderson updated her March 2009 letter, indicating that "[Florence] is still under the above restrictions."

During an August 2009 visit with Dr. Anderson, the doctor noted that Florence needed a brace for her knee.

In December 2009, Florence again visited Dr. Anderson reporting leg pain, poor balance, and knee pain, and requested a statement saying she could not work. Dr. Anderson again updated her March 2009 letter, indicating that "[Florence] is still under the above restrictions."

Florence returned in January 2010 with similar complaints. At that time, Dr. Anderson prepared a functional evaluation for Florence. Dr. Anderson rated Florence's prognosis as "Fair" and cited specific restrictions – namely, that Florence "can't stand for long periods or walk long distance due to pain." Dr. Anderson also completed a physical capacities evaluation for Florence. It provided that in an eight-hour workday Florence was limited to sitting for three hours and standing and walking in combination for three hours. She could occasionally lift up to twenty pounds, but never more than twenty. She could occasionally carry up to ten pounds, but never more than ten. Florence could not use her hands for repetitive actions such as pushing or pulling and fine manipulation. She could not use her feet for repetitive motion as in pushing and pulling of leg controls. Florence could occasionally bend and reach, but she was not able to squat, crawl, climb, stoop, balance, kneel, or crouch.

A February 2010 knee x-ray revealed mild medial compression. A subsequent visit to Dr. Anderson revealed increased crying episodes and increased pain in the winter months. Dr. Anderson diagnosed depression and anxiety and encouraged Florence to resume Cymbalta.

Also in February 2010, Florence visited Dr. Andrew Parr, an orthopedist, for knee pain. Dr. Parr prescribed physical therapy and a prescription trial of naproxen.

On March 31, 2010, Dr. Anderson wrote a follow-up note regarding Florence's ability to work, stating that "[Florence] is unable to work due to her multiple medical problems."

In April 2010, Florence returned for a visit to Dr. Parr. The doctor had written a prescription for physical therapy for Florence's knee pain, but Florence reported that she only attended a single session because there were issues with payment. Florence did not do the home exercises. In his assessment of Florence, Dr. Parr noted that "[t]he remarkable thing about her examination is that she is tender no matter where you press on her." Dr. Parr ascribed her leg pain to fibromyalgia but noted that Florence had full range of motion. He advised that weight loss, physical therapy, and stretching would relieve her pain, stating that "[p]hysical therapy is a must at this point." Dr. Parr noted that Florence had a "mild amount of arthritic change in both of her knees that I do not believe is contributing to all of her symptoms of pain in her lower extremities."

On November 16, 2010, Dr. Anderson indicated that the limitations she indicated on her physical evaluation form of January 2010 had existed on September 8, 2008.

### B. Psychiatric Treatment

Florence began psychotherapy with Donald Ferguson, M.S., at D and E Counseling Services on May 8, 2009, with appointments about once a week. At intake, Florence reported anger outbursts and difficulty concentrating and remembering. She reported fatigue and problems with sleeping. She had low energy, irritability, worry, and was easily moved to tears. When Florence was experiencing a bout of rage, she would yell, lie, name-call, curse, intimidate others, and deliberately annoy others. She reported displaying this behavior three to four times a week. On the intake summary, Ferguson noted that Florence complained of wrist, ankle, and chest pain due to her "up tightness." However, she reported her health was improving, and that her last physical was normal. She also complained of fights with her boyfriend, anger, and excessive alcohol intake. She was diagnosed with adjustment disorder with mixed anxiety and depressed mood. She was assessed a GAF of 53.

At a follow-up appointment on May 15, 2009, counseling was provided regarding expressing anxiety that was interfering with Florence's daily life.

At a follow-up on July 1, 2009, Florence reported isolating herself from her family. Later that same month, on July 29, 2009, counseling was provided regarding Florence's ability to manage specific fears. Florence also reported phobic anxiety that interfered with her daily life and her family's life.

On September 16, 2009, Ferguson noted that Florence displayed symptoms of hyper vigilance, such as feeling constantly on edge, having difficulty concentrating, and experiencing a general state of irritability.

On November 8, 2009, Florence's diagnosis was noted as Adjustment Disorder with Mixed Anxiety and Depressed Mood with a GAF of 54. On February 6, 2010, her diagnosis was indicated as "Major Depressive Disorder, NOS" with a GAF of 53. The same diagnosis was indicated in a therapy note on May 12, 2010, but her GAF was listed as 56. The same GAF was assessed in August and November 2010.

Also in November 2010, the clinic issued a functional evaluation indicating that her diagnosis was Major Depressive Disorder, NOS. The evaluator indicated specific restrictions as a result of Florence's current medical conditions and subsequent medical treatments, which were "currently [a]ffecting her mental capacity to sustain job duties." The accompanying mental residual capacity assessment indicated "marked" limitations in Florence's abilities to understand and remember detailed instructions; carry out very short and simple instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance; and be punctual within customary tolerances; work in coordination in proximity to others without being distracted by them; complete normal workday

and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.

### C.    Hearing Testimony

Florence lives with her ten-year-old son. At the time of the hearing, she was 5'5" tall and weighed 277 pounds.

She had last worked in August 2008 as a part-time school custodian, but she stopped working because she was missing work due to pain. She went to a doctor who told her she had fibromyalgia and the doctor told her to stop working. Florence has not attempted to return to work since August 2008 because she is in too much pain. She is not even able to stand at the bus stop.

Florence needs help to care for her personal needs. Her adult son and daughter help her. She has never had a driver's license, and her son and daughter drive her to the store. At the grocery store, her daughter puts the groceries in the cart.

Florence is occasionally able to cook, wash dishes, and do laundry, but she has difficulty performing these tasks because of pain in her hands, and difficulty walking and getting out of bed due to pain. Otherwise, she spends her days in bed watching television. Her ability to stand is limited to fifteen minutes and sitting is limited to ten minutes. Lifting is limited to ten pounds. Her son puts her socks on her and ties her shoelaces. Her daughter helps her up and down out of the bathtub and washes her.

Florence has problems with balance and falls frequently. She falls because her knees or ankle give out. Florence frequently drops things.

Florence was in pain at the hearing; specifically, she had pain in both hands and both ankles. She is taking medications for depression, muscle relaxers, and pain, such as Vicodin and ibuprofen. She takes medication to sleep and uses an inhaler for asthma. She has sleep apnea and uses a CPAP machine. Florence also has problems breathing if she walks too far. She gets out of breath if she walks one-fourth of a block and she has to stop performing an activity to rest every fifteen minutes because of shortness of breath and pain on the bottoms of her feet.

Her depression also causes her to have problems sleeping. Florence feels tired all the time. She feels worthless. She has difficulty concentrating and thinking, and loses track of television shows she is watching. She is forgetful.

## IV. THE ALJ'S DECISION

Applying the five-step analysis, the ALJ found that Florence was not disabled from September 8, 2008, through the date of his decision on February 16, 2011. At step one of the analysis, the ALJ found that Florence had not engaged in any substantial gainful activity since September 8, 2008, the alleged onset date of her disability. At step two, the ALJ determined that Florence suffered from the following severe impairments: fibromyalgia, degenerative joint disease in both knees, morbid obesity, and adjustment disorder (mixed). The ALJ further found that Florence's degenerative disc disease of the lumbar spine and obstructive sleep apnea were not severe. At step three of the analysis, the ALJ determined that none of Florence's severe impairments met or medically equaled a listed impairment.

At step four, the ALJ concluded that Florence retained the residual functional capacity ("RFC") to perform sedentary work described as follows. Florence should not climb ladders, ropes, or scaffolds, and climbing ramps and stairs is limited to 15% of a workday. The ALJ found that Florence can occasionally balance, stoop, crouch, kneel, and crawl. The ALJ limited Florence

to only occasional overhead reaching and only occasional reaching with fully extended arms. Florence should avoid concentrated exposure to extreme cold and heat, wetness or humidity. Florence must avoid concentrated exposure to respiratory irritants, such as fumes, odors, dusts, and gases. Florence must avoid use of moving machinery and unprotected heights. She is also limited to simple, routine, and repetitive tasks without specification as to the number of steps required to complete the task, in a low-stress job with only occasional changes in the work setting.

The ALJ concluded that, given Florence's RFC, she was not able to perform any of her past relevant work as a telemarketer, housekeeper, warehouse worker, and janitorial worker. However, considering her age, education, work experience, and RFC, the ALJ found that Florence was capable of performing other work that exists in significant numbers in the regional economy, including such representative occupations as charge account clerk, information clerk, and order clerk. Therefore, the ALJ determined at step five that Florence was not disabled.

## V. DISCUSSION

Florence advances several objections to the ALJ's decision, each is addressed below.

### A. Lack of Substantial Evidence to Support the ALJ's Decision

Florence argues that substantial evidence fails to support the ALJ's determination that Florence was not disabled due to her ailments. According to Florence, this error stems from the fact that the ALJ ignored evidence of Florence's medical and psychiatric ailments and rejected Dr. Anderson's January 2010 RFC and a November 2010 psychological RFC.

While an ALJ need not discuss every piece of evidence in his disability decision, *see Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995), an ALJ must "provide some glimpse into his reasoning . . . [and] build an accurate and logical bridge from the evidence to his conclusion." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

11

> With regard to Florence's physical ailments, the Court finds no error. Florence argues that
>
> the ALJ ignored essentially all of the medical and psychotherapeutic treatment evidence for the period from 7-6-07 to 11-16-10, although this evidence proved her disability and corroborated her allegations that she was not able to work. For example the evidence proved that she had pain and arthritis in her knees (R. 364-365, 324), feet, hands, wrists, ankles, spine and hips (R. 397, 324, 325, 326) The 6-2-08 rheumatological evaluation proved that her pain was due to fibromyalgia. (R. 327-328) Dr. Anderson's medical treatment confirmed her impairment due to chronic pain and fibromyalgia. (R. 393) Dr. Anderson's evaluations confirmed that her impairments were so severe that she could not sustain employment. (R. 252, 443, 449, 432)

Florence Br. at 12, Dkt. No. 17. However, the ALJ did not discredit Florence's diagnoses of fibromyalgia and degenerative joint disease; it was therefore not error for the ALJ not to cite additional evidence that "proved" that Florence suffered from these ailments. Furthermore, it was not error for the ALJ to apparently reject Dr. Anderson's conclusory allegations that Florence was "unable to work," as these notes provide no insight into Florence's condition and the question of disability is reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1).

Florence also argues that substantial evidence does not support the ALJ's limitations for her physical activities. According to Florence, the ALJ "arbitrarily rejected" Dr. Anderson's detailed RFC and failed to accord this treating physician the weight her opinion was due.

Indeed, a treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). However, if the treating physician's opinion is inconsistent with substantial evidence in the record, the ALJ need not give deference to that opinion. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

In this case, the ALJ did not "arbitrarily reject" the treating physician's proposed RFC. Rather, the ALJ sufficiently articulated his reasoning:

12

> [Dr. Anderson's] postural limits are not supported by the objective medical evidence, including her own treatment notes which show physical examination was normal, including examination of the extremities. . . . . Her opinions are contradicted by the opinion on the medical expert, whose opinion is afforded greater weight, since it is well supported by medically acceptable clinic and laboratory findings, as well as being consistent with the record when viewed in its entirety.

R. at 16 (record citations omitted). The ALJ therefore did not err on this basis.

However, turning to Florence's psychiatric impairments, the Court agrees with Florence. The ALJ provided only the most cursory analysis regarding whether Florence's adjustment disorder met Listing 12.04, and often just repeated his conclusions. For example, regarding activities of daily living, the ALJ found that "the claimant has mild restriction. That claimant has no more than mild restrictions in her ability to perform activities of daily living." R. at 12. In social functioning, the ALJ found that "the claimant has mild difficulties. The claimant has only mild difficulties maintaining social functioning." *Id.* The ALJ then supported these conclusions with broad, one-line statements of fact reflecting only testimony given at the hearing. For example, regarding social functioning, the ALJ supported his conclusion simply by noting that Florence "testified that she interacts with her church group." *Id.* However, psychotherapy notes provide insightful evidence contrary to the ALJ's conclusion. For example, in June 2009, Florence reported arguing within the family unit to the point of calling the police. In July 2009, Florence reported isolating herself from her family and peers in an effort to avoid the "hot buttons" that triggered her angry explosions.

As the ALJ fails to address the extensive record of Florence's adjustment disorder available in her psychotherapy treatment notes, the Court is unable to determine whether the ALJ even considered this evidence, nor can the Court determine whether substantial evidence supports the ALJ's reasoning. In making such a superficial sweep over the listing, the ALJ fails to articulate

an accurate and logical bridge from the evidence to his conclusion.

Florence also argues that the ALJ "ignored, without explanation" her psychologist's RFC. However, the ALJ did not "ignore" Florence's November 2010 psychological evaluation. Although it is unclear whether Ferguson is due any special deference under the regulations as an acceptable medical source, *see* 20 C.F.R. 404.1513(a)(2) (*licensed or certified* psychologists), the ALJ nevertheless considered his opinion:

> The undersigned also affords some weight to the opinion of the claimant's treating psychologist that her adjustment disorder is a severe impairment. . . , and the mental limitations are reflected in the residual functional capacity set forth above.

R. at 16 (record citations omitted). However, on a substantive level, the RFC the ALJ assigned to Florence does not accurately reflect the limitations set forth in that psychological evaluation. The ALJ limited Florence to "simple, routine and repetitive tasks without specification as to the number of steps required to complete the task, in a low stress job with only occasional changes in the work setting." However, this RFC omits significant portions of the psychologist's findings – for example, there is no limitation that reflects the psychologist's findings that Florence is markedly limited in her ability to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. On the brief analysis provided by the ALJ, the Court is unable to determine the extent of the weight the ALJ gave this psychological RFC and the ALJ's reasoning for extending that weight to it. It appears that the ALJ accepted some, but not all, of Ferguson's RFC, but the ALJ's reasoning for doing so is unclear. The Court is therefore unable to determine whether this portion of the ALJ's decision it is supported by substantial evidence.

### B. Failure to Summon a Medical Expert (Psychologist)

Florence next argues that the ALJ erred when he did not call a medical expert to consider whether her adjustment disorder met or medically equaled a listing. The Commissioner contends that there was no need to summon a medical expert because the ALJ was entitled to rely on state agency medical opinions.

Whether a claimant's condition equals a listed impairment is "strictly a medical determination" and "the focus must be on medical evidence." *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999). Nevertheless, an ALJ's decision to call a medical expert is discretionary, 20 C.F.R. § 416.927(f)(2)(iii), and an ALJ may rely on state agency physicians' opinions to determine disability. *Scott v. Sullivan,* 898 F.2d 519, 524 (7th Cir. 1990) (citing *Waite v. Bowen,* 819 F.2d 1356, 1360 (7th Cir. 1987)). However, as the Court has already explained above, the ALJ engaged in a superficial analysis of the listing requirements, and there is no indication that he relied on any medical evidence whatsoever, whether it was Florence's treating physician's opinion or state agency physicians' opinions. As a result, the Court is unable to determine whether the ALJ properly exercised his discretion with respect to a medical expert and whether the ALJ did in fact rely on the state agency physicians' opinions. Accordingly, the ALJ's decision must be reversed and remanded for further development on the listing analysis of Florence's adjustment disorder.

### C. Credibility Determination

Florence next argues that the ALJ's credibility determination is erroneous because the ALJ "ignored or rejected" the functional evaluations of Dr. Anderson and Florence's psychologist inasmuch as these records "corroborated" the location, duration, frequency, and intensity of Florence's pain.

An ALJ's assessment of the claimant's credibility is entitled to special deference and is not

grounds for reversal and remand unless it is "patently wrong." *E.g.*, *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). Here, as the Court has already explained above, the ALJ did not arbitrarily reject Dr. Anderson's opinion; rather, the ALJ appropriately considered it, rejected it, and articulated his reasoning. However, as detailed above, the ALJ's cursory explanation that he gave "some weight" to the psychological evaluation is insufficient to build a bridge between his decision and the evidence of record. For example, Florence testified that she has difficulty concentrating and focusing, and the psychological evaluation provided that she was "markedly limited" in her ability to carry out very short and simple instructions and maintain attention and concentration for extended periods. Although the ALJ purported to give "some weight" to the psychological analysis, he limited her to "simple, routine, and repetitive tasks without specification as to the number of steps required to complete the task." It is not clear how the evidence, admittedly accorded "some weight," can be reconciled with this portion for the RFC.[3]

---

[3] Florence further argues that the ALJ's decision is patently erroneous because it is perfunctory boilerplate and intentionally vague. While the ALJ recites a paragraph faulted by the Seventh Circuit as perfunctory, *Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011), the ALJ's decision in *Martinez* included "no explanation of which of Martinez's statements are not entirely credible or how credible or noncredible any of them are." This is simply not the case with this ALJ's decision. In several paragraphs preceding and following this "boilerplate" language, the ALJ highlights discrepancies between Florence's testimony and the medical evidence that led to the ALJ's conclusion.

Finally, as is so often the case, Florence points out that the ALJ's credibility discussion begins with the finding that the claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms are not credible to the extent they are inconsistent with the ALJ's RFC assessment. The Seventh Circuit has repeatedly noted that this boilerplate backwardly implies that the ability to work is determined first and is then used to determine the claimant's credibility. *Shauger v. Astrue,* 675 F.3d 690, 696 (7th Cir. 2012) (quoting *Bjornson v. Astrue,* 671 F.3d 640, 645 (7th Cir. 2012) and citing *Parker v. Astrue,* 597 F.3d 920, 921-22 (7th Cir. 2010)). Credibility findings must have support in the record, and such hackneyed language seen universally in decisions adds nothing. *Shauger,* 675 F.3d at 694 (citing *Punzio v. Astrue,* 630 F.3d 704, 709 (7th Cir. 2011) and *Parker,* 597 F.3d at 921–22)).

### D. Step 5 Determination

Finally, Florence contends that the ALJ's determination that she was not disabled because she could perform some jobs is in error. The source of this error, Florence argues, is the ALJ's RFC assessment, which is not supported by substantial evidence because it omits limitations due to Florence's mental impairments. The Court agrees. As set forth more fully in the analysis above, it is unclear what evidence – other than the hearing testimony – the ALJ considered when he assessed Florence's mental ailments and what weight he assigned to the evidence. The Court is therefore unable to determine whether the ALJ's RFC and the limitations it incorporates as to Florence's mental limitations are supported by substantial evidence. Accordingly, it is not clear that the hypothetical question posed to the vocational expert – whose answer indicated which jobs Florence could perform – adequately accounted for Florence's limitations.

### VI. CONCLUSION

As set forth above, the ALJ failed to build an accurate and logical bridge from the evidence of Florence's psychiatric records to his decision. The decision of the Commissioner is therefore **REVERSED AND REMANDED**. On remand, the ALJ should review, assess, and address the detailed evidence in the record as to Florence's psychiatric impairments.

SO ORDERED:   07/15/2013

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification.